## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) **COMPLAINT** |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| YORK COLLEGE OF PENNSYLVANIA, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff John Doe, by and through his attorneys, Brophy & Lenahan P.C., for his complaint against Defendant York College of Pennsylvania, respectfully alleges as follows:

### NATURE OF THE ACTION

1.    This action is based on York College of Pennsylvania ("York") having found John Doe ("John") responsible for "sexual harassment" for doing nothing more than expressing his romantic interest in another male student, Richard Roe ("Richard"), through non-sexual, non-physical conduct, and for York having subjected John to disciplinary proceedings that were so procedurally flawed as to virtually ensure the outcome against him, both on the "sexual harassment" charge and on other charges that inordinately and discriminatorily focused on John's sexual orientation and disability.[1]

---

[1]    John Doe and Richard Roe, obviously, are not the true names of the plaintiff or the student who accused John of sexual harassment.  John will be filing a motion for leave of this Court to proceed under a pseudonym because this case implicates extensive privacy issues for John, including, *inter alia*, highly personal details relating to his disability.

1

2.      During its investigation and the disciplinary process, York discriminated against John on the basis of his gender, disability, and sexual orientation, violating both federal law and York's own policies.

3.      Rather than providing John with the procedural safeguards which are essential components of Title IX of the Education Amendments of 1971 ("Title IX") and York's own policies, as set forth in its 2012-13 Student Handbook (the "Student Handbook"), York kept John in the dark about the charges against him and prevented him from having any meaningful opportunity to defend himself.  York refused to allow John to review even a redacted version of the incident report underlying his charges, did not allow him to ask questions — even indirectly — of the witnesses testifying against him, whom were identified to John only by pseudonyms such as "Student X" and "Student A", and did not provide John with an opportunity to review a record of the witness testimony against him.

4.      Furthermore, York's discriminatory animus against John shone through clearly throughout the investigation and the disciplinary process.  For example, the "sexual misconduct - sexual harassment" charges against John related to his having flirted with Richard in a departmental lounge — alleged conduct that, even accepted at face value, does not arise to sexual misconduct or sexual harassment, even under York's definition of those terms.  During the process, York was alerted to overtly sexual behavior directed by Richard toward female students, and by female students toward male students.  But, York ignored these reports and focused solely on the purported male-to-male "sexual misconduct - sexual harassment" of which John was accused.

5.    Throughout the investigation and disciplinary hearing, York's investigator, as well as the hearing board, further expressed their prejudice against John by, *inter alia*, inordinately focusing on John's sexual orientation, including John's propensity to introduce topics in class — referred to as "gay issues" in the investigator's summary of her witness interviews — that are of interest to LGBT individuals.  Discrimination against LGBT individuals based on gender stereotypes has been recognized by federal courts as a form of gender discrimination.

6.    Equally disturbing was York's pursuit of non-sexual "harassment" charges against John.  These charges specifically focused on John's mental illness, of which York had long been aware, and York's misguided notion that it was "harassment" for a student in a mental health crisis to reach out to friends when he had thoughts of self-harm and suicide.  This chilling position taken by York is in direct contravention to standard advice given to individuals with thoughts of suicide or self-harm, and directly contradicts advice linked to by the website of York's own Counseling Services Office, which encourages students struggling with mental illness to "take that first step by reaching out for help or opening up to a trusted friend of family member."

7.    Indeed, throughout the investigation process, and even in the terse "Hearing Outcome Record" that was provided to John after his hearing, York expressly based the non-sexual "harassment" claims against York on John's having "sen[t] multiple students text messages regarding acts of self-harm . . . ."   In doing so, rather than helping John through his mental health crisis, York drove John into a deeper crisis by punishing him for nothing more than seeking help from his friends in a time of crisis.

8.      Moreover, the final charge against John, for "Disruptive Conduct," focused in part on purported "disruptions" in the classroom.  Upon information and belief, the only classroom behavior discussed during the hearing or investigation was John's tendency to bring up topics that are often associated with LGBT individuals.

9.      Rather than conducting a fair disciplinary hearing, York put John's sexual orientation and disability on trial.  In fact, York's own Hearing Outcome Record and its investigator's witness interview summaries repeatedly reference John's sexual orientation and disability.

10.      Prior to this disciplinary proceeding, John was an excellent student, and planned to attend graduate school to continue his studies and pursue a career.  Because of the embarrassment and anguish caused by being unjustly accused of these infractions and being subject to a sham disciplinary proceeding, John's grades suffered, his reputation has been defamed and damaged among his professors and colleagues, and his career prospects and once promising future have been severely affected.  Due to the effects of the hearing on John, John has been unable to complete his studies at York and continue his academic and professional career.

11.      John now brings this action to have York's disciplinary actions vacated and to damages including, *inter alia*, actual and punitive damages, for York's discrimination against him in violation of Title IX, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and York's own policies, as outlined in the Student Handbook.

## **JURISDICTION AND VENUE**

12.      This Court has jurisdiction over John's claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1367(a).

4

13.     This action is authorized and instituted pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.,* the Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12182(a), *et seq.*, and the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*

14.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

15.     John is a citizen of the state of New Jersey.   He is currently a few credits short of graduating from York, but is not presently enrolled in classes.

16.     York is a private university located in York, Pennsylvania.  York is a Pennsylvania non-profit corporation.

17.     This Court has personal jurisdiction over York pursuant to Rule 4(c) of the Federal Rules of Civil Procedure and 246 Pa. Code § 302.

18.     York transacts business in Pennsylvania and entered into a contract with John in Pennsylvania.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).

## BACKGROUND

### John's Background

20.     John grew up in New Jersey, and graduated with honors from his high school in 2010.

21.     John was very involved in his high school community and received substantial accolades, such as the National Honor Society and the National Latin Honor Society.  John was also the president of several school organizations, and active in music and theatre.

22.     Also, since his senior year of high school, John has been openly gay.  In fact, at his high school, John co-founded his school's Gay-Straight Alliance, an organization whose mission is, among other things, to educate the school community about homophobia, gender identity, and sexual orientation issues, and to fight discrimination, harassment, and violence in schools.

23.     In the fall of 2010, John enrolled at York, where he continued his track record of excellent academics and community involvement, including involvement in issues relevant to the gay, lesbian, transgender and bi-sexual community.

24.     At the end of his sophomore year at York, John had a cumulative grade point average of 3.93 (out of 4.00).  John was also a member of the Dean's List for each of his first five semesters.

25.     John's success at York has come despite of the fact that he struggles with depression.  John has sought counseling resources at York for depression, self-harm, and suicidal thoughts, and York has regarded him as being afflicted with mental illness.

26.     In fact, during his freshman year, John experienced a mental health crisis, during which his roommate called Campus Safety due to his concern that John was practicing self-harm. In order to return to school, John was required to meet with Joseph T. Merkle ("Merkle"), York's Dean of Student Affairs.  During this meeting, Merkle expressed to John his bias against those with mental illness, telling John that York was "not a mental health institution."

27.     At York, John worked diligently toward continuing his career in graduate school and beyond.  He was a member of several honor societies and organizations in his scientific field, and was published in a scientific journal.

28.     However, John's career ambitions and mental well-being came to a screeching halt in the spring semester of 2013, when he became the victim of prosecution driven by gender stereotypes, homophobia and stigma and bias against those with mental illness.  During this prosecution, which resulted in John being found guilty of "sexual misconduct - sexual harassment," among other charges, York's administration failed to conduct a fair hearing, trampled upon several of John's rights in the disciplinary process, as mandated by Title IX and the Student Handbook, and punished John due to his mental illness, sexual orientation, and failure to conform with male gender stereotypes.  Today, because of this disciplinary proceeding and the disastrous effects it has had on John, John's once-promising career is very much in doubt.

**Spring 2013:  John Develops a Romantic Interest in Richard**

29.     In the fall of 2012, John met Richard, who had the same major as John at York and spent time in the same social and academic circles.

30.     John and Richard became friends.  They confided in each other about highly personal details about each other's lives, such as John's history of depression and Richard's own personal struggles, such as his own struggles with depression and his having been the victim of bullying in high school.

31.     In the spring semester of 2013, John developed romantic interest in Richard.  John expressed his interest in Richard to friends of his, and made posts on Facebook regarding his feelings for an anonymous "straight man."

32.     During the early part of the spring semester of 2013, Richard continued to be friendly with John.  For example, in late February 2013, Richard invited John to "hang out" with

Richard and his friends.  A few days later, John asked Richard if he wanted to go to a musical with him.

33.     John also occasionally flirted with Richard, but in a mild and non-physical manner.  One such occasion, which apparently formed the basis of the "sexual misconduct - sexual harassment" charges, occurred on or about the morning of April 5, 2013.  On that morning, John, Richard, and another male ("Student C") and three female students ("Student D", "Student E", and "John Witness 2") were in the departmental lounge.  Student D was flirting with Richard, saying to him, "talk nerdy to me."  In response, John said essentially the same thing to Richard, "I'll talk nerdy to you."  When Student C confronted John, suggesting that John having repeated Student D's "nerdy" comment was inappropriate, John responded jokingly, "you can't sexually harass a straight man."  Student C and Richard then left the room.

34.     On or about April 10, 2013, Richard confronted John -- not to accuse John of having sexually harassed him, but rather to tell John that Richard was straight and that John needed to stop telling others of his "crush" on Richard.

35.     After this conversation with Richard, John ceased all contact with Richard, and made every effort to avoid Richard.

**April 22, 2013:  Charges Are Filed Against John**

36.     On or about April 22, 2013, three York students, herein referred to as Student B, Student C, and Student D (collectively referred to as the "Reporting Students") made a frivolous report to a York Campus Safety Officer that John had sexually harassed Richard.  Richard did not speak to a Campus Safety Officer at this time.

37.     In fact, upon information and belief, Richard did not wish to pursue these frivolous charges against John, and only came forward several days after the Reporting Students made their frivolous report, after Richard was pressured by the Reporting Students to become involved in the claim against John.

38.     Around the same time, another York student ("Student A") reported to Campus Safety her concerns about John's mental well-being and her fear that John might hurt or kill himself.  Student A, however, was not among the students who made the frivolous "sexual misconduct - sexual harassment" charge.

**May 2, 2013:  John Learns of the Charges Against Him**

39.     On or about May 2, 2013, John received an e-mail from Nikki Batt ("Batt"), the Assistant Director of Residence Life for Student Conduct and Operations.  The e-mail from Batt informed John that he had been accused of four violations of York's Student Code of Conduct (the "Student Code"):  (a) "Sexual Misconduct/Sexual Harassment"; (b) "Harassment: Verbal"; (c) "Harassment: Written/Electronic"; and (d) "Disruptive Conduct" (collectively, the "Alleged Infractions").

40.     Batt's e-mail to John did not give the slightest indication or description of the conduct underlying the Alleged Infractions.  The e-mail did not include even basic information about the charges, such as the dates on which the conduct occurred, the names of the alleged victim or victims, or the content of the statement of the allegedly harassing statements.

41.     For example, under the heading "violation description" for the "sexual misconduct - sexual harassment" charge, Batt's e-mail stated, in its entirety, "Sexual Harrassment [sic] is defined as any verbal, non-verbal, and/or physical behavior of a sexual nature which

creates an uncomfortable environment for the victim. This behavior can include, but is not limited to unwelcome sexual advances, stalking, requests for sexual favors, and/or other conduct of a sexual nature."

42.     Batt's e-mail directed John to appear at a disciplinary hearing on May 7, 2013 — only five days after he was informed of the Alleged Infractions — to address the vague charges for which he was accused.  The hearing was subsequently rescheduled to May 9, 2013.

43.     On or about May 7, 2013, John met with Director Edward Bruder ("Bruder"), the director of Campus Safety at York, and Captain Marian Adams ("Adams"), the Campus Safety Officer who was tasked with investigating the matter.

44.     Although John requested to be informed of the nature of the accusations against him, neither Bruder nor Adams gave John sufficient details about the facts underlying the Alleged Infractions.

45.     Specifically, John was again refused pertinent information about the charges against him, including the incident report, which supposedly contains a more detailed description of the facts underlying the Alleged Infractions.  Bruder and Adams told John that they were denying his request for the incident report due to their expressed concerns about the confidentiality of John's accusers. But inexplicably, John was even refused a redacted version of the incident report that omitted the names of his accusers, and John has still not seen even a redacted version of the incident report to this day.

46.     John was, however, told by Bruder and/or Adams that the accusing students were concerned about John's mental well-being, and were afraid he would harm himself.  Neither

Bruder nor Adams explained whether York considered disciplinary proceedings to be an appropriate response to a student who was experiencing a mental health crisis.

47.      Upon information and belief, at the same time John was kept in the dark about the nature of the Alleged Infractions, one or more of John's professors received an e-mail and/or phone call from York administration regarding the charges.  These e-mails and/or calls caused John reputational damage within his department.

48.      During her investigation of the Alleged Infractions, Adams interviewed two students that approached her to defend John.  According to Adams's own summary of the interview, one of these students ("John Witness 1") reported numerous instances of overtly sexual behavior in the departmental lounge, including by female students:

> [The student] related that the atmosphere in that [departmental] lounge is one where nothing is off-limits to discuss.  Even females are bringing up things and instigating things.  Apparently, everyone [sic] tells all--what they did and who they did it with.  She gave several specific examples, once there were three girls taking pole dancing classes and they were demonstrating their moves to others, another time, one girl was bragging that she broke a rib while performing oral sex on a marine.  She said it was unbelievable what is said.  She said it was also not unusual for people to sit on other people's laps.  It occurs all of the time.  She did say, that even if someone says something innocent, others in that room turn an innocent comment into one of a sexual nature.

49.      This student's report about the sexually charged atmosphere in the departmental lounge was not given proper weight by Adams and the York administration, both in connection to John's hearing and thereafter.

50.      In fact, rather than seriously considering John Witness 1's report, Adams asked her questions regarding John's sexual orientation, such as whether John was bringing up topics in his classes relating to gay health issues such as AIDS.  In fact, Adams's summary of the

interview explicitly references John's sexual orientation and reflects Adams's focus on the fact

that John is gay:

> When asked if [John] says inappropriate things in class, things that would
> normally be considered sexual in nature.  [sic]  [The student] related that
> he brings up gay issues a lot.  She gave an example of a Chemistry
> professor who was discussing the concept of opposites attracting and as an
> analogy he used a scenario where two couples go to the prom and after the
> dance, they come out with two different partners.  [John] spoke up and
> asked the professor, "What if they are gay?"  The professor then felt he
> had to issue an apology to [John] in case he offended him.

> [The student] said all of [John's] presentations are about AIDS and that he
> forces the issue.  She thinks it is more everyone else's problem, not
> [John's]. . . . [The student] said [John] does try to do the gay platform
> thing, but, in his defense, she tries to focus on women's issues.  She knows
> other people are uncomfortable about the gay issues and she hears what
> they say and sees how they react.

51.     After her interview, John Witness 1 told John that Adams's questioning of her

appeared to be prejudiced against John.  John Witness 1 also informed John that Adams's

questioning had inordinately focused on John's sexual orientation and his association with issues

of interest to LGBT individuals.

52.     With regard to John's disability, Adams's notes from her interview with John

Witness 1 appear to reveal Adams's belief that by reaching out to other students while in a

mental health crisis, John somehow made those students "uncomfortable":

> I asked [the student] if she had ever gotten an unusual text or an
> uncomfortable text, e-mail or phone call from [John].  She responded that
> she has only ever gotten 1 or 2 texts from [John].  She knows he does self-
> harm, but he doesn't talk to her specifically about harming himself.  She
> never felt that [John] would do himself in.  She said he generalizes his
> statements, such as, "If I died, no one would care." or "Everyone would be
> better off if I died."

53.     Adams also wrote up a summary of her interview with another student who spoke to her in defense of John ("John Witness 2").  John Witness 2 was a direct witness to the April 5, 2013 exchange between John and Richard in the departmental lounge.

54.     John Witness 2's interview again reflected the double-standard York used when evaluating John's comments against similar comments made by female students in the departmental lounge:

> The only thing [John Witness 2] said she remembered was what one female, [presumably Student D] said to [presumably Richard] "Talk nerdy to me!"  Then she remembers [John] repeating the words, "Talk nerdy to me!" to [presumably Richard].[2]

55.     Following her interview with Adams, John Witness 2 informed John that Adams "was kind of mean to me like she didn't want anything to do with me at all."

56.     Additionally, upon information and belief, despite the reports of John Witness 1 and John Witness 2, neither Adams nor anyone at York ever investigated the reports of overtly sexual behavior occurring by female students toward male students, or by male students toward female students, in the departmental lounge, and no other students were ever brought up on disciplinary charges or punished for this alleged sexual behavior.

**May 9, 2013:  The Disciplinary Hearing**

57.     On May 9, 2013, John appeared before Batt and a three-member panel (the "Board") for a disciplinary proceeding regarding the Alleged Infractions.  Batt was the presiding officer at the disciplinary proceeding.  John asked Batt to provide information regarding the

---

[2]     The summary of Adams's interview with John Witness 2 that was provided to John redacted the names of the students present during this conversation.

hearing board's training and their knowledge of Title IX policies, but was refused such an explanation.

58.     At the hearing, Richard, Student A, and certain Reporting Students presented testimony to Batt and the Board.

59.     John has no knowledge of whether all of the Reporting Students testified at the hearing, as he was not permitted to be present during any of the witness testimony.  Similarly, Batt failed to provide John with a record of the witnesses' hearing testimony, despite the fact that the Student Handbook requires that a "record of the witness testimony will be available for review by all parties during the judicial hearing process."

60.     John also was prevented from confronting the witnesses against him.  Since he was not present during their testimony, John was not permitted to cross-examine the witnesses. Batt and the Board did not even give John the opportunity to examine the witnesses indirectly through an intermediary, such as Batt, the Board, or an advisor.

61.     Neither of John's witnesses testified at the disciplinary hearing, despite the fact that John Witness 2 — who came forward to Campus Safety in support of John — witnessed the April 5, 2013 conversation between John and Richard in the departmental lounge.

62.     Indeed, the day before the hearing took place, York's investigator, Adams, angrily told John that she refused to help John ensure the testimony of his witnesses, and refused to accept the phone number of John Witness 2, despite the fact that the Student Handbook provides that York "may also call witnesses in for testimony if it is deemed that an individual possesses relevant knowledge of an incident . . . ."

63.     At the times that John was allowed to be present at his own disciplinary hearing, York, through Batt and the Board, continued to deny him basic information about the charges or about the testimony against him.  As John was never informed of essential facts regarding his alleged conduct or given access to the testimonial and documentary evidence against him, he was not given any meaningful right to refute the charges against him.

64.     The only statement made by John that was referenced by in York's Hearing Outcome Record (the "Hearing Outcome Record") was John's statement that a "straight man could not be sexually harassed."  While John admitted to the Board that he had made this comment, he explained that he made it in a jovial, joking manner.  At no point in the proceeding did Batt or the Board explain how this innocuous statement was of "a sexual nature" or "create[d] an uncomfortable environment for the victim," as required by York's Student Code of Conduct, which gives examples for sexual harassment such as "unwelcome sexual advances, stalking, requests for sexual favors, and/or other conduct *of a sexual nature*." (emphasis added).

65.     John maintained, and still maintains, that he has never sexually harassed Richard and that he did not commit the other Alleged Infractions.  John contended throughout his disciplinary proceedings that the charges against him were fueled by homophobia and John's non-conformance with traditional male stereotypes, and John and his witnesses brought York's attention to explicit sexual conduct directed by male students toward female students, or by female students toward male students, that was commonplace in his departmental lounge.

66.     Indeed, Richard was no stranger to engaging in sexually explicit behavior in the departmental lounge.   For example, as John informed York during John's disciplinary process, John has seen Richard put his face in between a woman's legs to talk to her genitalia, frequently

sit on women's laps, and pick up women and carry them around the department while they kick,

yell, punch and bite him.  John has never engaged in any conduct remotely akin to Richard's

conduct toward women in his departmental lounge, and, to John's knowledge, none of Richard's

conduct has resulted in sexual harassment charges against Richard or an investigation or the

initiation of disciplinary proceedings by York.

67.     Furthermore, John was subject to numerous questions regarding his sexual

orientation and his struggles with self-harm and suicidal ideation.  In fact, during the process,

John came to realize that a main component of the non-sexual "harassment" claims was the fact

that he reached out to students whom he thought were his friends about his mental health crises,

and that these students were apparently "uncomfortable" with John's efforts to discuss his mental

struggles with them.

68.     The nature of the questioning that John endured revealed that York was

stereotyping John based on his gender by making John's sexual orientation a major focus of the

charges against him.  Indeed, York's own Hearing Outcome Record explicitly refers to John's

being gay:

> [John] stated that he is a "walking taboo" that lives in a heterosexist state.
> He stated he discusses gay issues and gay topics to make conversation that
> will change a heterosexist culture and society.  He stated that if the topics
> of conversation he brings up or the comments he makes make other people
> uncomfortable that is the other person's problem.  He said he is not
> responsible for how others feel about those comments or topics.

69.     Similarly, the Hearing Outcome Record addresses John's struggles with mental

illness:

> The board questioned [John] regarding his behaviors of communicating
> self-harm or acts of self-harm against himself.  [John] confirmed that he

has texted people (other students) - who he thought were friends - regarding feelings of self-harm.

70.     At the conclusion of the hearing, and still with scant details of what conduct underlay the Alleged Infractions, John was found responsible for committing each of the Alleged Infractions.

**John Receives The "Hearing Outcome Record"**

71.     Following the hearing, John was provided with a document entitled, "Hearing Outcome Record."  The Hearing Outcome Record did not contain a record or summary of each witness's testimony, and continued York's practice of keeping John in the dark about the basis for the charges against him. For example, with regard to John's "sexual misconduct - sexual harassment" charge, the only hint of the substance of their testimony was that John had said  — with no specified context — that a "straight man could not be sexually harassed," and that "[e]ach student that witnessed the alleged sexual harassment toward student X [Richard] stated they were uncomfortable with the sexual comments and wanted it to stop."

72.     Outside of a reference to the out-of-context statement, "a straight man cannot be sexually harassed," nowhere in the Hearing Outcome Record were the allegedly "sexually harassing" comments summarized, nor was John provided with the names of his accusers or the dates on which the alleged "sexual harassment" occurred.  But without providing any detail about the allegedly sexually harassing comments, the Hearing Outcome Record concluded that the unspecified "conduct create[d] an intimidating, hostile, or offensive working or learning environment."

73.     But where the Hearing Outcome Record was conspicuously lacking in facts underlying the alleged "sexual harassment," it was not shy about mentioning John's disability.

74.     For example, the Hearing Outcome Record stated that the Reporting Students were "uncomfortable" with information John had confided in them regarding his mental health. In fact, these alleged statements made by John (again, without specificity) were referred to in the Hearing Outcome Record as one basis for the Board's decision that John had committed an infraction of the "Harassment: Electronic" item in the Code of Conduct.

75.     Additionally, the Hearing Outcome Record stated, without absolutely no detail or elaboration, that John had committed "Disruptive Conduct" by having "created disruptions that meet the definition under the student code of conduct both in the classroom and the [departmental] lounge."  Upon information and belief, the only classroom "conduct" that was discussed at the hearing or during the investigation was John's tendency to introduce topics that are often associated with LGBT individuals.

76.     The Board imposed the following disciplinary sanctions on John, including: (a) John was banned from his departmental lounge, a central facility for students and faculty in John's field of study; (b) John was placed under disciplinary probation through graduation; (c) John was issued a "notice of suspension," which documented the violation in York's records and required that any further violations result in John's expulsion; (d) John was required to enter into a "behavioral contract" with Batt, "regarding in-classroom behaviors and understanding community standards"; and (e) John's parents were notified of his being found responsible for the Alleged Infractions (collectively, the "Sanctions").

**May 16, 2013:  John's Appeal Is Denied**

77.     The Student Handbook affords students who have been found responsible for violations of the Code of Conduct the right to file an appeal from the Board's decision.

78.     Without a meaningful summary of the testimony against him, the details underlying the Alleged Infractions, or even a redacted version of the incident report, John nevertheless attempted to file an appeal.  In his appeal, filed on or about May 13, 2013, John offered his best guess of the names of the witnesses who testified against him and the nature of their testimony, despite having continually been kept in the dark about these most basic facts.

79.     In his appeal, John argued, *inter alia*, that he was not given a fair hearing because York administration failed to properly inform him of the facts underlying the charges, and that the charges against him were homophobic and heterosexist in nature, while more extreme behavior in his departmental lounge that is heterosexual in nature is tolerated without question.

80.     John's appeal was adjudicated by Darrien Davenport ("Davenport") of the York Appeal Review Board and Joseph T. Merkle ("Merkle"), the Dean of Student Affairs.  Merkle had previously expressed to John his bias against those with mental illness, telling John that York was "not a mental health institution."

81.     On or about May 16, 2013, Davenport and Merkle sent John a letter denying his appeal and upholding his disciplinary sanctions.  The letter stated, *inter alia*, that the procedures in the Student Handbook were "followed as outlined," and "the case was heard appropriately on the charges and evidence presented."

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.)

82.     John repeats and re-alleges the allegations set forth in paragraphs 1 to 81 as if fully set forth herein.

83.     Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681(a) (1988) ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

84.     Upon information and belief, York receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to York by its students or given to York by the federal government directly, and is therefore subject to Title IX.

85.     The Title IX guidelines issued by the U.S. Department of Education's Office for Civil Rights (the "OCR") mandate a "prompt and equitable resolution" of sexual harassment complaints, which requires an "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence." (OCR, Dear Colleague Letter (Apr. 4, 2011), at 8-9, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).

86.     The OCR Title IX guidelines further provide that "[t]hroughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be

afforded *similar and timely access to any information that will be used at the hearing.*"   Id. at 11. (emphasis added).

87.     Schools also have an obligation under Title IX to ensure that all employees involved in sexual harassment proceedings have "adequate training as to what conduct constitutes sexual harassment."

88.     Federal courts and the OCR have interpreted the "on the basis of sex" language of Title IX to include discrimination based on an individual's non-conformance with typical gender stereotypes or traditional gender roles.

89.     As York is well-aware, John, through his words and actions, including his having expressed a romantic interest in another man and his having advanced issues that are traditionally of interest to the LGBT community, exhibits behavior which is widely considered to be stereotypically inappropriate for his gender, and does not comply with traditional societal stereotypes of how men "ought to behave."

### Count 1 - Erroneous Outcome From A Flawed Proceeding

90.     York deprived John, on the basis of his sex, of his Title IX rights by subjecting him to a flawed proceeding, incorrectly finding him responsible for "sexual misconduct - sexual harassment" for non-sexual conduct, and repeatedly exhibiting gender bias and inappropriate gender stereotyping against him by focusing on John's sexual orientation throughout the disciplinary process.

91.     York failed to accord John with an equitable and impartial disciplinary process in several fundamental ways, so as to virtually assure a finding of guilt against him:

A.  <u>No Access To Documentary And Testimonial Evidence</u>:  York refused to provide John with even a redacted copy of the incident report and denied him the opportunity to hear the witnesses' testimony or receive a record of the witness testimony.

B.  <u>No Ability To Refute The Witnesses' Testimony</u>:  York handcuffed John's ability to defend himself by prohibiting him from challenging the testimony of Richard or the other witnesses against him through cross-examination or other means.  John was not even permitted a limited form of cross-examination through an intermediary, as is common in many university disciplinary hearings.  This restriction prohibited John from refuting the witnesses testimony by testing, *inter alia*, their veracity and credibility and exploring their motivations for bringing the complaint.

C.  <u>No Specificity To Nature Of Accusations Against Him</u>:  The limited information John was provided about the accusations against him omitted the most basic details such as the names of the complainants, the dates of the alleged harassment, and the content of the allegedly harassing behavior.

D.  <u>Improper Shifting of Burden of Proof</u>:  Rather than requiring the Reporting Students and Richard to prove sexual harassment by the "preponderance of the evidence," as required by Title IX, York improperly shifted the burden of proof to John and treated him as "guilty before proven innocent."

E.  <u>Failure To Ensure Attendance of Critical Witnesses</u>:  Despite the fact that it had the ability and power to do so, York made no effort to ensure the attendance of John Witness 1 or John Witness 2 at the disciplinary hearing.  This disinterest in John's witnesses kept the Board from hearing the testimony of John Witness 2, a witness to the alleged "sexual harassment," who had reported to the investigator both the innocuous nature of John's comments and the fact that a female student made essentially the same comment to Richard moments before John did.  John Witness 1, who reported extreme sexual behavior of female students in the same departmental lounge, was also ignored by York administration.

F.  <u>Insufficient Time To Prepare A Defense Or An Appeal</u>:  The disciplinary hearing took place only seven days after John was informed of the charges against him, and John's appeal was required to be filed within 48 hours of the hearing.

92.  At the conclusion of the disciplinary hearing and after ignoring John's Title IX

rights, the Board issued an incorrect decision and found John responsible for "sexual misconduct

- sexual harassment" despite the alleged conduct having been innocuous and non-sexual in
nature.

93.     The biased and one-sided process deprived John, as a gay, male student, of
educational opportunities by discriminating against him based on his non-conformance with
traditional male stereotypes.

94.     During the investigation and disciplinary hearing, York's administration and staff
reflected its discriminatory animus against John in several ways:

A.   Questioning John's Witness Regarding "Gay Issues":  Captain Marian Adams,
     the investigator of the complaint against John, inordinately focused on John's
     sexual orientation during her investigation.  John Witness 1 reported — and
     Adams's own summary reflects — that Adams asked John Witness 1
     questions about whether John promoted "gay issues" in the classroom, despite
     the fact that this should not have had any relevance to the charges against
     John.

B.   Regarding Commonly "Gay" Topics as "Disruptions":  From the scant
     information John received about his hearing, it was obvious that he was being
     punished, in part, for bringing up topics during class that are often associated
     with LGBT individuals.  While the Hearing Outcome Record provided
     absolutely no factual support for the Board having found John responsible for
     having "creat[ing] disruptions . . . in the classroom," Adams's summary of her
     interview with John Witness 1 strongly suggested that York considered such
     evidence in punishing John:  "When asked if [John] says inappropriate things
     in class, things that would normally be considered sexual in nature. [sic] [The
     student] related that he brings up gay issues a lot. . . . [John Witness 1] said all
     of [John's] presentations are about AIDS and he forces the issue."

C.   Ignoring Identical Conduct Between Students Of The Opposite Sex:  John
     Witness 2 reported to Adams that seconds before John flirted with Richard on
     April 5, 2013, Student D, a female student who was one of the Reporting
     Students, said essentially the same thing to Richard, "talk nerdy to me."  Yet,
     Student D was not investigated or disciplined for this conduct.

D.   Selective Enforcement Of Sexual Harassment Policy:  As noted in greater
     detail below, during John's disciplinary process, York learned of several
     students who engaged in explicitly sexual conduct in the departmental lounge

in question, but ignored these reports and selectively continued its prosecution of John.

95.    By the own words and actions of its administration and staff, as outlined above, York reflected discriminatory animus against John throughout the hearing process for John's failure to conform with traditional male gender stereotypes.  Combined with the procedural violations of Title IX outlined above, the result was that John was punished for merely expressing his romantic interest in another male student — conduct that was non-sexual in nature and did not even approach the standards set forth by York's own Student Code of Conduct.

96.    The outcome of the disciplinary process against John was clearly erroneous, arbitrary and capricious; York was on notice of, and was deliberately indifferent to, the serious procedural irregularities that infused the proceedings; and throughout the process, York displayed its hostility and prejudice against John for his non-conformance with traditional gender stereotypes.

97.    As a direct, proximate, and foreseeable consequence of York's aforementioned discrimination against John, John has been seriously and irreparably damaged.  John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, including the loss of his educational payments already made, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

## Count 2:  Selective Enforcement

98.     In further violation of Title IX, York has discriminated against John, on the basis of his gender and his non-conformance with traditional male stereotypes, through its discriminatory, inequitable implementation of York's disciplinary proceedings against John.

99.     During the course of the disciplinary proceedings against John, York learned of several instances of overt sexual behavior by female students in John's departmental lounge, as well as blatant sexual behavior by Richard toward female students in the same departmental lounge.  But while York held John to a laughably low standard of what constitutes sexual harassment, upon learning of more extreme behavior by female students, and by a male student toward female students, York did nothing.

100.     Specifically, during John's disciplinary process, York learned of the following male-to-female and female-to-male instances of sexual behavior and/or flirting:

    A.  Sexually-Charged Conduct of Richard:  John maintained during his disciplinary proceedings that Richard, in the presence of John and others, often behaved in a graphically sexual manner toward female students in the departmental lounge.  As John informed York during John's disciplinary process, John has seen Richard put his face in between a woman's legs to talk to her genitalia, frequently sit on women's laps, and pick up women and carry them around the department while they kick, yell, punch and bite him.

    B.  Overtly Sexual Behavior Of Female Students In The Departmental Lounge:  John Witness 1 reported to York's investigator, Captain Marian Adams, that a raucous sexual environment took place in the departmental lounge, including three female students demonstrating their "pole dancing" moves and another female student "bragging that she broke a rib while performing oral sex on a marine."

    C.  Virtually Identical Flirting Toward Richard By Student D:  John Witness 2 reported to Adams that seconds before John flirted with Richard by saying "I'll talk nerdy to you" to him on April 5, 2013, Student D (one of the Reporting Students) said essentially the same thing to Richard, "talk nerdy to me."

101.    The OCR instructs schools that if it "knows or reasonably should know about student-on-student harassment that creates a hostile environment," it must "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." (OCR, Dear Colleague Letter (Apr. 4, 2011), at 4, *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf).  This guidance applies "[r]egardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures."  Id.

102.    Upon information and belief, despite this guidance from the OCR, York made no effort to investigate any of the sexual behavior that it learned occurred in the departmental lounge, and brought neither Richard nor any other students up on charges relating to this alleged behavior.  Nor did York investigate or charge Student D, a female student, for making a flirtatious comment to Richard that was virtually identical to the comment made by John.

103.    By punishing John for innocuous male-to-male flirting while ignoring equal and more extreme behavior of a sexual nature by males directed at females or females directed by males, York discriminated against John by applying traditional gender stereotypes to him. By selectively enforcing its standards of sexual harassment on the basis of gender stereotypes, York denied John of the equal access to education that Title IX is designed to protect.

104.    As a direct, proximate, and foreseeable consequence of York's aforementioned conduct, John has been seriously and irreparably damaged.  John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, including the

loss of his educational payments already made, loss of educational and professional

opportunities, loss of future career prospects, and other direct and consequential damages.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract:  Disciplinary Hearing Process)

105.    John repeats and re-alleges the allegations set forth in paragraphs 1 to 104 as if

fully set forth herein.

106.    At all times relevant hereto, a contractual relationship existed between York and

John through York's Student Handbook, which is a valid, binding and enforceable contract

between York and John.

107.    York is required to act in accordance with the Student Handbook in adjudicating

reports of alleged violations of the Student Code of Conduct.

108.    John fully complied with all of his obligations under the Student Handbook.

109.    The "Disciplinary Process and Student Rights" section of the Student Handbook

sets forth that York "will invoke judicial procedural fair play," and that students "are guaranteed

the right to a fair hearing during the disciplinary process."  These rights include, among others,

"the right to be informed of the nature of the accusation against him/her," and "the right to refute

the charges and that there be a provision for such."  York breached each of these obligations

during John's disciplinary process.

110.    York breached its obligation to provide John "the right to be informed of the

nature of the accusation against him/her" by keeping John in the dark about the charges against

him, including, *inter alia*, denying him access to even a redacted version of the incident report,

refusing to allow him to review a record of the witness testimony against him, and failing to

provide him with the identity of Richard or the Reporting Students, the dates on which the

allegedly harassing statements occurred, and the content of the allegedly harassing statements.

111.    York also breached its obligation to provide John "the right to refute the charges"

by preventing him from learning all details behind the charges (as explained more thoroughly

above), prohibiting him from cross-examining the witnesses, even through an intermediary, and

failing to ensure the attendance of John's witnesses, including John Witness 2, who supported

John and was a direct witness to the alleged "sexual harassment."

112.    In total, the hearing procedure conducted by York, which kept John uninformed

about basic facts underlying the charges against him and prohibited him from presenting a

meaningful defense, violated the Student Handbook's requirement that York "will invoke judicial

procedural fair play," and violated John's "right to a fair hearing during the disciplinary process."

113.    John has incurred, and will continue to incur, significant damage as a direct result

of York's breaches of the Disciplinary Process section of the Student Handbook, including but

not limited to damages to physical well-being, emotional and psychological damages, damages

to reputation, past and future economic losses, including the loss of his educational payments

already made, loss of educational and professional opportunities, loss of future career prospects,

and other direct and consequential damages.

### THIRD CLAIM FOR RELIEF
### (Breach of Contract: Discrimination Based on Sexual Orientation)

114.    John repeats and re-alleges the allegations set forth in paragraphs 1 to 113 as if

fully set forth herein.

115.    The Student Handbook sets forth in several places York's policy against discrimination based on sexual orientation.  For instance, the "Anti-Discrimination Policy" in the the Student Handbook reads, "[a]ll students are encouraged to participate in College activities regardless of sex, race, color, creed, national origin, religion, <u>sexual orientation</u>, disability, social affiliation or age.  York College does not tolerate and takes a firm position against all forms of discrimination as noted."  (emphasis added).

116.    The Student Handbook sets forth similar prohibitions against discrimination based on sexual orientation for student participation in York academics and York student organizations.

117.    York subjected John to a disciplinary hearing, and found him responsible for and sanctioned him for alleged "sexual harassment," based on his expressing romantic interest in a male student through non-sexual, innocuous flirting.  Indeed, the sole statement by John referred to by York in its Hearing Outcome Record, "a straight man cannot be sexually harassed," did not meet York's own definitions of sexual harassment or sexual misconduct, which requires that the conduct be sexual in nature.

118.    At the same time, instances of sexual behavior toward females by male students and by male students toward female students — including by Richard — have been ignored by York administration and faculty.

119.    By treating John differently than it treats heterosexual students, York violated its own prohibition against discrimination based on sexual orientation.

120.    John has incurred, and will continue to incur, significant damage as a direct result of York's breach of its policy against discrimination based on sexual orientation, including but not limited to damages to physical well-being, emotional and psychological damages, damages

to reputation, past and future economic losses, including the loss of his educational payments already made, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**FOURTH CLAIM FOR RELIEF**
**(Violation of Title III of the Americans With Disabilities Act,**
**42 U.S.C. § 12182, *et seq.*)**

121.     John repeats and re-alleges the allegations set forth in paragraphs 1 to 120 as if fully set forth herein.

122.     Title III of the Americans with Disabilities Act ("ADA") prohibits discrimination against individuals on the basis of disability in the full and equal enjoyment of the services of any place of public accommodation.  42 U.S.C. § 12182, *et seq.*; 28 C.F.R. § 36.102, *et seq.*

123.     York is a place of public accommodation within the meaning of the ADA because it is a "private school or other place of education."  42 U.S.C. § 12181(7)(J).

124.     John has at all relevant times been qualified to attend York.  Indeed, John was a Dean's List student at York for each of his first five semesters.

125.     John has a disability as defined by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, in that he has a mental impairment that substantially limits one or more of his major life activities. Specifically, John suffers from depression, which has caused him to practice self-harm and to have suicidal thoughts.

126.     York is well aware of John's disability, and has been so aware since John's freshman year at York.  York has at all relevant times regarded John as an individual with a disability as defined by the ADA.

127.    At times, John has sought help from York counselors as well as fellow York students to help cope with his depression.  To that end, John has, at times, shared details regarding his struggles with mental illness to other classmates at York, as well as to York counselors and administrators.

128.     Indeed, on one occasion during John's freshman year at York, Joseph T. Merkle, the Dean of Student Affairs, during a meeting with John about his disability, expressed his bias against those with mental illness by telling John that York was "not a mental health institution."

129.    Through the actions outlined above, York discriminated against John in violation of the ADA by subjecting him to a disciplinary process and subjecting him to sanctions due to, in large part, his disability.  Indeed, York's Hearing Outcome Record specifically cited John's having reaching out to other students about self-harm as a ground for finding him responsible for the "Harassment:Electronic" charge, and the summaries prepared by York's investigator, Adams, reflect an undue focus on John's having reached out to other students when in a mental health crisis and experiencing suicidal ideations and thoughts of self-harm.

130.    The process of reaching out to others is, however, exactly what York instructs students with mental illness to do in a crisis situation.  For example, www.ulifeline.org, a website that York's Counseling Services directs its students to, instructs, "reaching out for support is the first step to feeling better. . . . take that first step by reaching out for help or opening up to a trusted friend of family member.  There are ways to feel better, but you have to tell someone what you're going through."  http://www.ulifeline.org/get_help_now (last visited 05/09/2015); see also http://www.ycp.edu/offices-and-services/counseling-services/additional-resources (last visited 05/09/2015) (referring students to www.ulifeline.org for "suicide prevention").

131.    Although John did exactly what is encouraged of people in a mental health crisis — reaching out to others — York responded to John's actions by sanctioning him for his conduct, including sanctions that limited John's full access to York's educational facilities.

132.    Through these sanctions, York denied John the full and equal enjoyment of the services, facilities and/or advantages of York because of his mental illness, in violation of 42 U.S.C. § 12182 and 28 C.F.R. § 36.102.

133.    John was harmed by York's discrimination and therefore is an aggrieved person as defined in 42 U.S.C. § 12188.

134.    As a direct, proximate, and foreseeable consequence of York's aforementioned discrimination against John, John has been seriously and irreparably damaged.  John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, including the loss of his educational payments already made, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

### FIFTH CLAIM FOR RELIEF
### (Violation of the Section 504 of the Rehabilitation Act of 1973,
### 29 U.S.C. § 794 *et seq.*)

135.    John repeats and re-alleges the allegations set forth in paragraphs 1 to 134 as if fully set forth herein.

136.    Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, prohibits any program or activity receiving federal financial assistance from discriminating against individuals on the basis of their disability.

137.    York, which has known of John's mental illness since his freshman year of college, has at all relevant times regarded John as an individual with a disability.

138.    John has at all relevant times been qualified to attend York.  Indeed, John was a Dean's List student at York for each of his first five semesters.

139.    Upon information and belief, York receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to York by its students or given to York by the federal government directly, and is therefore subject to the Rehabilitation Act.

140.    As a result of the conduct above, in which John was punished by York based on his mental illness, York denied John participation in and the benefits of attending York and discriminated against John on the basis of his disability.  Specifically, York engaged in this discrimination by disciplining John based, in substantial part, on his mental illness, in violation of the Rehabilitation Act and its implementing regulations.

141.    As a direct, proximate, and foreseeable consequence of York's aforementioned discrimination against John, John has been seriously and irreparably damaged.  John's academic and career prospects, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, including the loss of his educational payments already made, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Contract: Discrimination Based on Disability)**

142.    John repeats and re-alleges the allegations set forth in paragraphs 1 to 141 as if fully set forth herein.

143.    The Student Handbook sets forth in several places York's policy against discrimination based on disability.  For instance, the Student Handbook reads, "[a]ll students are encouraged to participate in College activities regardless of sex, race, color, creed, national origin, religion, sexual orientation, <u>disability</u>, social affiliation or age.  York College does not tolerate and takes a firm position against all forms of discrimination as noted."  (emphasis added).

144.    The Student Handbook sets forth similar prohibitions against discrimination based on disability for student participation in York academics and York student organizations.

145.    Furthermore, York's website promises that York "will not discriminate against any qualified student with a disability in accordance with Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990." ([http://www.ycp.edu/offices-and-services/academic-services/disability-support-services/](http://www.ycp.edu/offices-and-services/academic-services/disability-support-services/)) (last visited 05/09/2015).

146.    Rather than help John to overcome his disability, York used the disciplinary process to punish John for it.  During the course of the disciplinary proceedings, and as noted explicitly in the Hearing Outcome Record, John's punishment was based, in part, on the fact that he allegedly "had send [sic] multiple students text messages regarding acts of self-harm," which purportedly made students feel "uncomfortable."

147.     By disciplining John for seeking help from others to cope with his depression, and by treating John differently than it treats students who are not disabled, York discriminated against John based on his disability.

148.     John has incurred, and will continue to incur, significant damage as a direct result of York's breach of its policy against non-discrimination based on disability, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, including the loss of his educational payments already made, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court::

A.     Order York to reverse its findings of responsibility and Sanctions against John and order York to expunge any reference to the findings of responsibility and Sanctions from York's records, including without limitation from John's education records;

B.     Order York to verify this reversal and expungement of John's records at York by providing John with a notarized letter confirming that the findings and sanctions have been so reversed and that any reference to the findings of responsibility and Sanctions have been expunged from York's records, including without limitation from John's education records;

C.     Award John compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of York's wrongful conduct, in an amount to be determined at trial;

D.     Award John punitive damages in an amount to be determined at trial;

E.      Award John special damages in an amount to be determined at trial;

F.      Award John pre-judgment and post-judgment interest;

G.      Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) (relating to Title

IX), 42 U.S.C. § 1988(b) (relating to ADA), 29 U.S.C. § 794a(b) (relating to Rehabilitation Act),

and/or pursuant to other statute or common law doctrine providing for such award; and

H.      Grant such other and further relief that the Court deems just and proper.

                                        Respectfully submitted,

                                        BROPHY & LENAHAN P.C.

                                        By:      /s/ Joseph Alexander Brophy
                                                 Joseph Alexander Brophy, Esq.
                                                 (PA Bar No. 311080)
                                                 2101 Pine Street
                                                 Philadelphia, PA  19103
                                                 (215) 558-7600 (office)
                                                 (215) 449-3376 (fax)
                                                 alex.brophy@brophylenahan.com
                                                 *Attorneys for Plaintiff*

Dated: May 11, 2015